

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**

INTEGRITY ● TRANSPARENCY ● INDEPENDENCE ● TIMELINESS

Log # 2022-0532

## FINAL SUMMARY REPORT[1]

### I.   EXECUTIVE SUMMARY

On February 14, 2022, the Civilian Office of Police Accountability (COPA) received a web complaint from ▇▇▇▇▇▇▇ reporting alleged misconduct by members of the Chicago Police Department (CPD). ▇▇▇ alleged that on the evening of February 8, 2022, he was pulled over by Officer Demetrius Prothro, Officer Carl Smith, and Officer Jamel Pankey for failure to signal while turning and for lack of a front license plate. At the conclusion of the stop, ▇▇▇ was arrested and taken into CPD custody. ▇▇▇ was charged with a violation of 430 ILCS 66/10(H) (the Illinois Firearm Concealed Carry Act) for a failure to disclose a concealed firearm; a violation of 625 ILCS 5/11-804(B) for failing to signal when turning; and two Municipal Code of Chicago (MCC) ordinance violations for possessing a high capacity magazine (8-20-085(A)) and lack of a front license plate (9-76-160(F)).[2] In his interview with COPA, ▇▇▇ said that he never failed to disclose his firearm to Officers Smith and Prothro when asked if he was carrying a weapon; therefore, he alleged that was unlawfully arrested based on the Illinois Firearm Concealed Carry Act violation and that Officer Prothro misrepresented facts in reports related to that purported violation.[3] COPA also served an allegation Sergeant (Sgt.) Ignatius Goetz for failing to properly direct his subordinates regarding the cited violation of MCC 8-20-085(A), as he should have known this charge was inapplicable to ▇▇▇

Following its investigation, COPA reached Sustained findings regarding all allegations brought against Officer Prothro, Officer Smith, and Sgt. Goetz.

### II.   SUMMARY OF EVIDENCE[4]

On February 8, 2022, at approximately 8:16 pm, Officers Prothro, Smith, and Pankey stopped a black Jeep Grand Cherokee driven by ▇▇▇▇▇▇▇ at 750 W 76th St. The basis of the stop was the vehicle's lack of a front plate and the driver's failure to signal while turning.[5] Body-worn camera (BWC) footage depicts that at the beginning of the stop, Officer Smith approached

---

[1] Appendix A includes case identifiers such as the date, time, and location of the incident, the involved parties and their demographics, and the applicable rules and policies.

[2] Att. 2.

[3] One or more of these allegations fall within COPA's jurisdiction pursuant to Chicago Municipal Code § 2-78-120. Therefore, COPA determined it would be the primary investigative agency in this matter.

[4] The following is a summary of what COPA finds most likely occurred during this incident. This summary utilized information from several different sources, including BWC footage, police reports, civilian interviews, and officer interviews.

[5] Atts. 2, 11, and 13.

the vehicle on the driver's side,[6] with Officer Prothro standing at the passenger window.[7] Officer Pankey initially walked up to the driver's side of the vehicle as well.[8] Officer Smith informed ███ of the basis of the traffic stop, citing his failure to activate his turn signal and lack of a front plate, before then requesting identification.[9] Officer Smith said words to the effect of, "You got FOID or concealed carry?" and ███ nodded and said "yes."[10] Officer Smith then appeared to notice a firearm that was in between ███ knees, and Officer Smith said words to the effect of, "Let me see that," before reaching into the vehicle and retrieving the firearm from ███ lap.[11] Officer Smith then asked ███ to exit the vehicle before also commenting on ███ movements, stating, "Hey, hey, hey, stop moving, stop moving."[12] At that time, ███ appeared to be unbuckling his seatbelt and reaching into his pockets.[13] ███ then replied, "You asked for my wallet!"[14] The officers again asked ███ out of the car, citing officer safety. ███ then exited the vehicle and was handcuffed by Officer Smith.[15]

Officer Prothro explained to ███ "You're just being detained, you're not under arrest. Let me explain . . . you're doing too much movement, for officer safety."[16] ███ responded by repeating that he was merely looking for his wallet, which the officers had requested. ███ then told the officers that his wallet and identification were in his right back pocket, which Officer Smith retrieved. Officers Smith and Pankey then returned to the patrol vehicle to run ███ identification while ███ stood at the back of his vehicle with Officer Prothro. Around that time, Sgt. Goetz, the officers' supervisor, arrived. Officers Smith and Pankey noted that ███ possessed concealed carry licenses in both Florida and Illinois. The officers then noted, "you can't have one to two [*sic*] states,"[17] however, this distinction was not explained. Also, both officers noted that ███ firearm had an extended magazine. Officer Smith explained to Sgt. Goetz that ███ had the firearm between his legs.[18] Officer Pankey then stated, "Oh, look at this. FOID canceled. I knew it, you can't have one in two states."[19] Sgt. Goetz responded, "Yeah, you can't."[20] Officer Pankey then stated that per the computer, ███ FOID was active in the system,[21] but he still ran the FOID number over the radio to confirm its status. There appeared to be some confusion as to whether ███ could possess FOIDs in two different states, but Officer Pankey explained to Sgt.

---

[6] Att. 4 at 2:00.
[7] Att. 5 at 2:06.
[8] Att. 3 at 2:13.
[9] Att. 4 at 2:10.
[10] Att. 4 at 2:40.
[11] Att. 4 at 2:45.
[12] Att. 4 at 2:48.
[13] Att. 4 at 2:43.
[14] Att. 4 at 2:53.
[15] Att. 4 at 3:07.
[16] Att. 4 at 3:20.
[17] Att. 4 at 5:30.
[18] Att. 4 at 7:15.
[19] Att. 4 at 7:33.
[20] Att. 4 at 7:38.
[21] Att. 3 at 8:09.

Goetz that regardless, there was a violation due to the extended magazine on ███████firearm.[22] Sgt. Goetz then told the officers, "I think you should bring him in."[23] The officers exited the vehicle and Officer Pankey explained to ██████ that he is going to be placed in custody for a concealed carry violation, specifically that he cannot have an extended magazine.[24] Sgt. Goetz then asked Officer Pankey, "Did he disclose to you guys, that he was armed, or no?"[25] Officer Pankey responded by stating, "Yeah, we asked him and he said 'yeah,' but he was like, kind of like clenching, as if he . . . (unintelligible) . . . . We asked him to step out the car for us and he didn't wanna do it."[26]

███████ *Miranda* rights were read, and a transport unit arrived to bring █████to the 6th District police station for processing. Officers then conducted a custodial search of ███████ vehicle.[27] Offenses cited on reports documenting the arrest included a violation of 430 ILCS 66.0/10-H for failing to disclose a firearm license/concealed firearm during an investigative stop; a violation of MCC 8-20-085(A) regarding the possession of a high capacity magazine; a violation of 625 ILCS 5.0/11-804-B for failing to activate the vehicle's turn signal when making a turn; and a violation of MCC 9-76-106(F) related to the requirement of a license plate affixed to the front of the vehicle.[28]

███████ submitted a web complaint via COPA's website on February 14, 2022,[29] where he alleged that he was arrested unlawfully by CPD officers for firearms violations.[30] ███████was interviewed by COPA,[31] and he reiterated that he believed he was arrested unlawfully by Officers Smith and Prothro, explaining that he did not fail to disclose his licensure status or his concealed firearm, and also that the Illinois Firearm Concealed Carry Act preempts the City's ordinance regarding the possession of a high-capacity magazine and magazine extensions.[32] Further, █████ alleged that the way the officers wrote the reports related to the incident misrepresented the facts of the stop regarding him concealing his weapon. He explained that he was never trying to hide the firearm, and also that the officer discovered the firearm immediately – not that the officer saw the firearm later, or that he failed to disclose that he was in possession of a firearm, which is how the narrative section is written on the Arrest Report, Case Incident Report, and Investigatory Stop Report. ███████criminal case related to this incident was disposed on March 1, 2022, when all of the charges were stricken off with leave to reinstate.[33]

---

[22] Att. 3 at 12:38.
[23] Att. 3 at 13:00.
[24] Att. 3 at 13:38.
[25] Att. 16 at 12:10.
[26] Att. 16 at 12:10.
[27] Att. 3 at 24:00.
[28] Atts. 2 and 13.
[29] Att. 11.
[30] Att. 11, pg. 2.
[31] Att. 10.
[32] Att. 10 at 16:29.
[33] Att. 1.

Log # 2022-0532

### III.   ALLEGATIONS

***Officer Carl Smith, Star #18090:***
1. Arrested ▮▮▮▮▮▮▮▮ without justification.
   - **Sustained**.
   - Violations of Rules 2, 3, 8, 10, and 11.

***Officer Demetrius Prothro, Star #8805:***
1. Arrested ▮▮▮▮▮▮▮▮ without justification.
   - **Sustained**.
   - Violations of Rules 2, 3, 8, 10, and 11.

2. Made one or more false, misleading, inaccurate, and/or incomplete statements when completing his Arrest Report narrative, when he reported that "A/O Smith asked Mr. ▮▮▮▮ if there was [sic] any weapons within the vehicle which Mr. ▮▮▮▮ nervously continued to look about the vehicle while making furtive movements with both hands."
   - **Sustained**.
   - Violations of Rules 2, 3, 10, and 11.

3. Made one or more false, misleading, inaccurate, and/or incomplete statements when completing his Original Case Incident Report narrative, when he reported that "A/O Smith asked Mr. ▮▮▮▮ if there was [sic] any weapons within the vehicle which Mr. ▮▮▮▮ nervously continued to look about the vehicle while making furtive movements with both hands."
   - **Sustained**.
   - Violations of Rules 2, 3, 10, and 11.

4. Made one or more false, misleading, inaccurate, and/or incomplete statements when completing his Investigatory Stop Report narrative, when he reported that "A/O Smith asked Mr. ▮▮▮▮ if there was [sic] any weapons within the vehicle which Mr. ▮▮▮▮ nervously continued to look about the vehicle while making furtive movements with both hands."
   - **Sustained**.
   - Violations of Rules 2, 3, 10, and 11.

***Sergeant Ignatius Goetz, Star #1664:***
1. Failing to properly direct subordinates, as he should have directed his officers to not include the charge regarding a "high-capacity magazine" when completing their reports in relation to the arrest of ▮▮▮▮▮▮▮▮ specifically the cited violation of 8-20-085(A), because he should have known this charge was inapplicable to ▮▮▮▮
   - **Sustained**.
   - Violations of Rules 2, 3, 5, 6, 10, and 11.

## IV.     CREDIBILITY ASSESSMENT

Both ██████and the accused CPD members provided accounts of this incident that are consistent with each other and with the available BWC recordings. While COPA credits the accused members' factual accounts, COPA does not credit the explanations they offered for their actions, as discussed further below. Also, COPA has found that Officer Prothro made one or more false, misleading, inaccurate, and/or incomplete statements when completing various report narratives documenting this incident.

## V.     ANALYSIS[34]

### a.  Arrest Without Justification

It is first alleged that Officer Demetrius Prothro and Officer Carl Smith arrested ██████ ██████without justification.

Here, ██████was arrested based on two firearm violations: a violation of 430 ILCS 66.0/10-H for failing to disclose a firearm license/concealed firearm during an investigative stop and a violation of MCC 8-20-085(A) regarding the possession of a high capacity magazine.[35] Section H of the Illinois Firearm Concealed Carry Act provides that if an officer initiates an investigative stop, upon the request of the officer, a licensee must disclose that he or she possesses a concealed firearm, present his or her license, and identify the firearm's location.[36] In other words, when an officer initiates an investigatory stop, the licensee is not required to disclose information about a concealed firearm until the officer makes a request.[37] However, once the request is made, the licensee must disclose to the officer that he or she is in possession of a concealed firearm under the Act, present his or her license to the officer, and identify the location of the concealed firearm.[38] Next, MCC 8-20-085 prohibits, *inter alia*, a person from carrying, possessing, selling, offering, or displaying for sale any high-capacity magazine.[39]

In his interview with COPA investigators on May 3, 2023,[40] Officer Prothro explained that ██████arrest was based on two firearm violations: (1) failing to disclose his concealed firearm and licensure status, and (2) possession of a high-capacity magazine.[41] Officer Prothro recounted that when he approached ██████vehicle, he observed ██████extreme nervousness,

---

[34] For a definition of COPA's findings and standards of proof, *see* Appendix B.

[35] Att. 2. Given that the only remaining offenses allegedly committed by ██████were minor traffic offenses (no front license plate and failure to signal a turn), and given that Mr. ██████had a valid driver's license, Special Order S04-14-02, section III, would require the officer issuing any personal service citations to allow ██████to execute a written promise to comply by signing the tickets. An arrest would not be authorized absent some additional offense or unless Mr. ██████had declined the opportunity to sign the tickets.

[36] Att. 15, 430 ILCS 66/10(h). Att. 15.

[37] *See* People v. Spain, 2019 IL App (1st) 163184, ¶ 50.

[38] *See* People v. Spain, 2019 IL App (1st) 163184, ¶ 50.

[39] Att. 14, MCC 8-20-085(a).

[40] Att. 19.

[41] Att. 19 at 10:45.

clenched legs, heavy breathing, and furtive movement about the vehicle before Officer Smith retrieved a firearm from ██████[42] Regarding ██████ alleged failure to disclose his firearm and concealed-carry status, Officer Prothro explained that because he had approached the vehicle on the passenger's side, he was unable to hear the entirety of the initial conversation between Officer Smith and ██████ However, based on his training and experience, as well as his knowledge of the Illinois Firearm Concealed Carry Act, "I was always told, he [the subject of the investigatory stop] must present and inform officers that he has a firearm in the vehicle, as well as the firearm needs to be concealed properly."[43] Officer Prothro reiterated that he did not recall Officer Smith asking ██████ whether he had a CCL/FOID because he was unable to hear their conversation, explaining, "I was not able to observe it or hear it in this moment, so I believe it was related later that it was asked [██████ CCL/FOID status], and that's why it [the violation for a failure to disclose] was placed in the report,"[44] and, "That's why he was charged with that statute."[45] However, Officer Smith agreed that the law does not require someone to reveal their CCL/FOID status during an investigatory stop unless prompted by an officer.[46] Regarding ██████ alleged unlawful possession of an extended magazine on his firearm, Officer Prothro recalled that Officer Smith, in retrieving the firearm from ██████ lap, grabbed the weapon by its magazine, which immediately led the officers to believe that the magazine contained more rounds than was allotted.[47] He described that visually, an extended magazine looks different than a regular magazine, explaining that "it's protruding from the handle of the firearm, you can see it clear as day."[48]

Similarly, in his interview with COPA on June 2, 2023,[49] Officer Smith reiterated that the officers' basis for stopping ██████ was based on both his failure to signal and lack of front plate, which he explained to ██████ immediately upon approaching his vehicle.[50] Officer Smith recalled that he then asked ██████ if he had a license and insurance as well as a FOID or CCL, recounting, "According to my body cam, he moved around, and that's when I saw the extended clip poking out the base of the firearm."[51] Officer Smith then retrieved the firearm from between ██████ knees and asked ██████ to exit the vehicle. When asked to point out where ██████ failed to disclose his FOID/CCL status and possession of a firearm, Officer Smith answered, "Typically, I don't know if . . . I don't know at this point in time, if my partner, because my partner did the initial report for the case and arrest, if he noticed, if he probably heard me ask him, or thought I asked him, so I don't know, at that point in time maybe he thought I did, I usually give my schpiel [*sic*] of any drugs, weapons, or alcohol, which I did. . . . At that time, he did not disclose that he had it, I mean, I retrieved the weapon immediately and asked him out of the car due to the extended

---

[42] Att. 19 at 8:51.
[43] Att. 19 at 13:00.
[44] Att. 19 at 17:30.
[45] Att. 19 at 13:45.
[46] Att. 19 at 14:10.
[47] Att. 19 at 21:07.
[48] Att. 19 at 21:50.
[49] Att. 20.
[50] Att. 20 at 6:19.
[51] Att. 20 at 7:00.

magazine at the base of the weapon."[52] Officer Smith continued by stating that ▮▮▮▮ "disclosed he had a FOID/CCL, per the body camera, but he did not disclose that he had a weapon, at that point, according to the body camera."[53] Regarding ▮▮▮▮ possession of a high-capacity magazine, Officer Smith recounted that he had observed the magazine extending, or sticking out, of the base of ▮▮▮▮ firearm, which is what led him to believe that the City ordinance had been violated.[54]

▮▮▮▮ arrest by Officers Prothro and Smith was without justification for several reasons. First, a violation of 430 ILCS 66/10(h) related to ▮▮▮▮ alleged failure to disclose his concealed firearm and licensure status simply did not occur. The BWC footage shows that when Officer Smith initially approached ▮▮▮▮ vehicle, Officer Smith asked ▮▮▮▮ "You got [*sic*] FOID or concealed carry," and ▮▮▮▮ both nodded and said "yes."[55] Officer Smith then immediately retrieved a firearm from ▮▮▮▮ lap.[56] As explained above, Illinois law requires that a licensee disclose that he or she is in possession of a concealed firearm or his or her CCL/FOID licensure status only upon request of the officer. Thus, ▮▮▮▮ did not have a duty to disclose to Officer Smith unprompted that he was in possession of a CCL, FOID, or firearm until prompted by the officer's question. Once Officer Smith inquired as to whether ▮▮▮▮ had the proper licensure, ▮▮▮▮ disclosed that he did, all in apparent compliance with the law.[57] It is important to note that gun possession alone, or initial silence regarding the ownership of a valid CCL/FOID, is not enough to create probable cause to arrest, as Illinois law does not require licensees to volunteer this information.[58] Silence in the face of multiple officers is not unreasonable or inherently suspicious.[59] Therefore, there was a lack of probable cause to arrest ▮▮▮▮ based on a violation of 430 ILCS 66/10(h).

▮▮▮▮ arrest based on possession of a high-capacity magazine, in violation of MCC 8-20-085, is similarly without justification. Regardless of whether ▮▮▮▮ was in possession of a high-capacity magazine in his firearm, Section 90 of the Illinois Firearm Concealed Carry Act provides that the regulation of guns and ammunition by licensees are exclusive powers and functions of the State.[60] This means that any ordinance or regulation enacted on or before the effective date of the Concealed Carry Act that imposes regulations or restrictions on licensees, handguns, or ammunition for handguns in a manner that is inconsistent with the Concealed Carry Act shall be invalid in its application to licensees.[61] The Illinois FOID Card Act similarly touches on the topic of preemption. Specifically, Section 13.1 of the FOID Act states that the regulation, licensing, possession, and registration of handguns and ammunition for a handgun, and the transportation of any firearm and ammunition by a holder of a valid FOID issued by the

---

[52] Att. 20 at 14:19.
[53] Att. 20 at 16:30.
[54] Att. 20 at 18:20.
[55] Att. 4 at 2:40.
[56] Att. 4 at 2:45.
[57] Att. 15.
[58] *See* People v. Spain, 2019 IL App (1st) 163184, ¶ 38.
[59] *Spain,* 2019 IL App (1st), ¶ 49.
[60] Att. 17, 430 ILCS 66/10.
[61] Att. 17, 430 ILCS 66/10.

Department of State Police are exclusive powers and functions of this State, and further, that any ordinance or regulation enacted on or before the effective date of this Act that purports to impose regulations or restrictions on a holder of a valid FOID in a manner that is inconsistent with this Act shall be invalid in its application to that FOID holder.[62] The effective dates of Illinois' Concealed Carry Act and FOID Act are July 9, 2013,[63] and August 20, 2021,[64] while the effective date of MCC 8-20-085 is July 2, 2010. This means that the City ordinance related to the prohibition of the possession of high-capacity magazines, as it imposes regulations and restrictions on licensees and their handguns and ammunition, is invalid to licensees under the Concealed Carry Act and the FOID Act. Because both Section 90 of the Concealed Carry Act and Section 13.1 of the FOID Act prohibits home rule units, such as the City of Chicago, from regulating the handguns or ammunition of valid licensure holders in a way that is inconsistent with the Acts regarding any ordinance or regulation enacted on or before their effective dates, MCC8-20-085 is preempted by both the Concealed Carry and FOID Acts.[65] Therefore, there was no probable cause to arrest ▇▇▇ based on his possession of a high-capacity magazine. As sworn members of CPD who receive legal training related to relevant legal issues, both Officers Smith and Prothro have a responsibility to learn and follow applicable legal precedent. This includes Illinois firearm legislation such as the Concealed Carry and FOID Acts.

Because ▇▇▇ did not fail to disclose his CCL/FOID licensure status and fully complied with the disclosure requirements of 430 ILCS 66/10(h), and because the Illinois Concealed Carry Act and FOID Act preempt regulation by the City of Chicago relating to the possession or ownership of high-capacity magazines, there was a lack of probable cause to arrest ▇▇▇ based on violations of 430 ILCS 66/10(h) and MCC 8-20-085(A), and ▇▇▇ was arrested without justification. Notably, both Officer Prothro and Officer Smith, in their interviews with COPA, explained that ▇▇▇ would not have been arrested solely based on the traffic violations he committed.[66] Therefore, COPA finds that Allegation 1 against Officer Demetrius Prothro and Allegation 1 against Officer Carl Smith are **Sustained**. By arresting ▇▇▇ without justification, Officer Prothro and Officer Smith violated Rules 2, 3, 8, 10, and 11.

### b. Statements in Reports

It has next been alleged that Officer Prothro made one or more false, misleading, inaccurate, and/or incomplete statements when completing his Arrest Report, Original Case Incident Report, and Investigatory Stop Report narratives, where he wrote in each, "A/O Smith asked Mr. ▇▇▇ if there was [*sic*] any weapons within the vehicle which Mr. ▇▇▇ nervously continued to look about the vehicle while making furtive movements with both hands." This

---

[62] Att. 22, 430 ILCS 65/13.1.
[63] Att. 17.
[64] Att. 22.
[65] *See* Easterday v. Vill. of Deerfield, 2020 IL App (2d) 190879, ¶¶ 66-71 (examining an ordinance similar to Chicago's that had been enacted by the Village of Deerfield, and concluding, "[T]o the extent that Deerfield's ban of large capacity magazines regulates ammunition for handguns, it is preempted in its application to holders of valid FOID cards and concealed carry licenses by section 13.1(b) of the FOID Card Act and section 90 of the Concealed Carry Act.").
[66] Att. 19 at 22:53; Att. 20 at 22:00.

narrative omits the fact that ██████ answered Officer Smith's question affirmatively, creating the false impression that ██████ did not answer the question and falsely implicating ██████ for failing to disclose his CCL/FOID licensure status and the presence of his licensed firearm.

Officer Prothro is listed as either the arresting officer, reporting officer, or first officer in the three reports authored following this incident: the Arrest Report, Original Case Incident Report, and Investigatory Stop Report. All three narratives in all three reports contain the sentence, "A/O Smith asked Mr. ██████ if there was [*sic*] any weapons within the vehicle which Mr. ██████ nervously continued to look about the vehicle while making furtive movements with both hands." In his interview with COPA, Officer Prothro explained that he generally does all the writing for his team and that he wrote the Arrest Report, Case Report, and Investigatory Stop Report.[67] He further explained that in addition to relying on his independent recollection of the arrest, he also reviewed his own BWC recording prior to writing the reports.[68] On the date of his interview with COPA, Officer Prothro recalled – based on both his independent recollection and his review of his own BWC footage – that ██████ was nervous and fidgety, breathing heavily, had his legs clenched, and did not make eye contact with Officer Smith as they were speaking after the officers conducted the traffic stop, but he did not recall hearing the entirety of the conversation between Officer Smith and ██████[69] Officer Prothro also said that even after reviewing his own BWC footage, he would not make any amendments to his narratives if given the chance, and he believed them to be an accurate description of what occurred.[70]

Officer Prothro's use of the sentence, "A/O Smith asked Mr. ██████ if there was [*sic*] any weapons within the vehicle which Mr. ██████ nervously continued to look about the vehicle while making furtive movements with both hands," in the narratives of the Arrest Report,[71] Case Report,[72] and Investigatory Stop Report[73] is a false, misleading, and inaccurate characterization of what occurred. In the context of these reports, this sentence was used to support the charge against ██████ for allegedly failing to disclose that he was carrying a firearm in violation of the Illinois Firearm Concealed Carry Act, even though ██████ had actually made the required disclosure. BWC footage of the officers' initial interaction with ██████ depicts that Officer Smith walked up to ██████ window and informed him of the basis of the traffic stop, citing his failure to activate his turn signal and lack of front plate, before then requesting identification.[74] Officer Smith then stated words to the effect of, "You got [*sic*] FOID or concealed carry?" and ██████ nodded and said "yes."[75] Officer Smith then reached into ██████ vehicle and retrieved the firearm from ██████ lap.[76] At no point during that interaction did ██████ fail to answer Officer Smith's question, nor did he make furtive movements or "nervously continue to look about the vehicle." Both Officer

---

[67] Att. 19 at 23:30.
[68] Att. 19 at 24:00.
[69] Att. 19 at 26:20.
[70] Att. 19 at 27:28.
[71] Att. 2, pg. 3.
[72] Att. 13, pg. 3.
[73] Att. 11, pg. 2.
[74] Att. 4 at 2:10.
[75] Att. 4 at 2:40.
[76] Att. 4 at 2:45.

Prothro and Officer Smith's body-worn camera footage refute such a representation of the facts. While Officer Smith did instruct ▇▇▇ to "stop moving" after he asked ▇▇▇ to exit the vehicle,[77] this occurred after Officer Smith had asked ▇▇▇ for his license and vehicle registration. BWC footage shows ▇▇▇ reminding him, "You asked for my wallet," and unbuckling his seatbelt to reach into his pockets, presumably to look for his wallet.[78]

It is clear from the available BWC footage that Officer Prothro's use of the sentence, "A/O Smith asked Mr. ▇▇▇ if there was [*sic*] any weapons within the vehicle which Mr. ▇▇▇ nervously continued to look about the vehicle while making furtive movements with both hands," to describe the officers' interaction with ▇▇▇ in the narratives of the Arrest Report, Case Report, and Investigatory Stop Report is an incomplete and misleading account of what occurred. Therefore, COPA finds that Allegations 2, 3, and 4 against Officer Demetrius Prothro are **Sustained**. By creating the incomplete and misleading report narratives, Officer Prothro violated Rules 2, 3, 10, and 11.[79]

### c. Failure to Properly Direct Subordinates

It has next been alleged that Sgt. Ignatius Goetz failed to properly direct his subordinates regarding the cited violation of 8-20-085(A), which contributed to ▇▇▇▇▇ arrest. Specifically, COPA alleged that Sgt. Goetz should have directed his officers to not include the charge citing a violation of 8-20-085(A) for possession of a "high-capacity magazine" when completing their reports in relation to the arrest of ▇▇▇ as Sgt. Goetz should have known this charge was inapplicable to ▇▇▇

Supervisors of all ranks are accountable for the performance of subordinate members directly observed or under their direct command.[80] Supervisors must be knowledgeable about the law, CPD policies, and unit-level directives which apply to their positions, duties, and responsibilities in order to be a resource to other CPD members.[81]

---

[77] Att. 4 at 2:48.

[78] Att. 4 at 2:53.

[79] COPA considered sustaining Rule 14 allegations against Officer Prothro based on the incomplete and misleading narratives in his reports. To sustain an allegation of a violation of Rule 14, COPA would be required to prove by a preponderance of evidence that Officer Prothro's report narrative(s) were false, that the false narrative(s) were created willfully, and that the narrative(s) were regarding a material issue. Here, the report narratives documenting ▇▇▇ actions prior to his arrest are undoubtedly material because they document the officers' probable-cause basis for arresting ▇▇▇ The narratives have also been shown to be false, at least by a preponderance of evidence, because ▇▇▇ did not continue to look about the vehicle while making furtive movements with both hands after being asked if there were any weapons in his vehicle. However, Officer Prothro would likely argue that he perceived the events in this way, in that he did not fully hear the conversation between Officer Smith and ▇▇▇ from the opposite side of ▇▇▇ vehicle and that he subjectively considered ▇▇▇ to be nervous and to be making furtive movements, even if those movements are not visible in the BWC recordings, or even if those movements actually occurred after Officer Smith had already recovered ▇▇▇ handgun. Because Officer Prothro's false and/or misleading report narratives could be attributed to inattention, incompetency, and/or inefficiency, rather than willfulness, COPA has sustained the related allegations under Rules 2, 3, 10 and 11, rather than Rule 14.

[80] Att. 23, G01-09(III)(B).

[81] Att. 23, G01-09(III)(A).

In his interview with COPA investigators on June 26, 2023,[82] Sgt. Goetz explained that when he arrived at the scene, ███ was already in handcuffs. He recounted that once he arrived, he was told by the officers on scene that "the arrestee had a firearm, an extended magazine, in between his legs, and . . . they had him detained upon my arrival."[83] Sgt. Goetz also recalled that he was told by the officers that ███ did have a valid CCL at the time of the arrest,[84] but that ███ was going to be arrested for both CCL violations and an extended magazine, as well as the two traffic violations.[85] Sgt. Goetz admitted that while he was familiar with MCC 8-20-085, he was not familiar with Section 90 of the Illinois Concealed Carry Act related to preemption.[86] After reviewing Section 90, he acknowledged that Section 90 "would supersede the City [ordinance],"[87] and he further agreed it would be fair to say that based on the language of Section 90, that bans imposed by ordinances such as 8-20-085 are preempted by state law.[88]

As a CPD supervisor, Sgt. Goetz was expected to be familiar with the law, as well as CPD policies and directives,[89] and further, he was accountable for the performances of subordinate members directly observed or under his command.[90] Police officers are generally held responsible "with having knowledge of well-established legal principles."[91] As sworn members of CPD who receive legal training related to relevant caselaw and other legal issues, officers have a responsibility to learn and follow applicable legal precedent. This includes Illinois firearm legislation, such as the Illinois Firearm Concealed Carry Act and Illinois FOID Act.

While Sgt. Goetz acknowledged in his interview with COPA that he now realizes that state law preempts MCC 8-20-085, he also said that this knowledge would not have changed his response on scene. He explained, "No, because I knew there was a law on the book, I advised them to bring in the subject and to, you know, finish their investigation inside, I don't know every law on the street."[92] He also emphasized that his recommendation to the arresting officers on scene was to bring ███ to the police station to "investigate further."[93] Regardless, as a supervisor, it was Sgt. Goetz's responsibility to be well-informed and up to date on basic legal principles to better direct his subordinates. Furthermore, Sgt. Goetz's explanation to investigators that he told the officers to merely bring ███ to the station for further investigation and did not specifically instruct them to arrest him is a misleading characterization of what occurred. While Sgt. Goetz is depicted on BWC telling the officers, "I think you should bring him in,"[94] he did not specify that

---

[82] Att. 21.

[83] Att. 21 at 9:21.

[84] Att. 21 at 9:35.

[85] Att. 21 at 10:05.

[86] Att. 21 at 12:40.

[87] Att. 21 at 13:30.

[88] Att. 21 at 14:10.

[89] Att. 23, G01-09(III)(A)(5).

[90] Att. 23, G01-09(III)(B).

[91] *See* United States v. Koerth, 312 F.3d 862, 869 (7th Cir. 2002), quoting United States v. Brown, 832 F.2d 991, 995 (7th Cir.1987); *see also* United States v. Adames, 56 F.3d 737, 747 (7th Cir. 1995); United States v. Mykytiuk, 402 F.3d 773, 777 (7th Cir. 2005).

[92] Att. 21 at 14:30.

[93] Att. 21 at 14:50.

[94] Att. 3 at 13:00.

this meant solely for further investigation and not for an arrest. There is also no evidence to suggest that Sgt. Goetz directed the officers to take any further investigative steps after the officers brought ███ to the station. Therefore, COPA finds that Allegation 1 against Sgt. Ignatius Goetz is **Sustained**. By failing to properly direct his subordinates, Sgt. Goetz violated CPD policy and Rules 2, 3, 5, 6, 10, and 11.

## VI. DISCIPLINARY RECOMMENDATION[95]

### a. Officer Carl Smith

#### i. Complimentary and Disciplinary History

Officer Smith has received two Department Commendations, 97 Honorable Mentions, and the 2019 Crime Reduction Award. Officer Smith was reprimanded for being absent or leaving a duty assignment in December 2022.

#### ii. Recommended Discipline

COPA has found that Officer Smith violated Rules 2, 3, 8, 10, and 11 by arresting ███ without justification. As a police officer, Officer Smith was expected to be familiar with Illinois laws regarding the possession of firearms, and he should have known that a citizen with a valid concealed carry license was allowed to possess a handgun with an extended magazine. Likewise, Officer Smith should have recognized that ███ was not obligated to disclose that he possessed a firearm until Officer Smith asked, and that ███ response was adequate. Also, while Officer Smith did not author the reports associated with ███ arrest, Officer Smith was the officer who most directly interacted with ███ and Officer Smith should have collaborated more closely with his partner in preparing the reports, possibly avoiding the errors that were made by Officer Prothro. Considering all of the above, and considering Officer Smith's complimentary and disciplinary history, COPA recommends that Officer Smith serve a 5-day suspension.

### b. Officer Demetrius Prothro

#### i. Complimentary and Disciplinary History

Officer Prothro has received one Life Saving Award, the Police Officer of the Month Award, three Top Gun Arrest Awards, 240 Honorable Mentions, and four additional awards and commendations. Officer Prothro has no sustained complaints on his disciplinary history.

#### ii. Recommended Discipline

COPA has found that Officer Prothro violated Rules 2, 3, 8, 10, and 11 by arresting ███ without justification and that Officer Prothro violated Rules 2, 3, 10, and 11 by authoring report

---

[95] *See* Att. 39 for accused CPD member complimentary and disciplinary histories.

narratives that contained material omissions and were misleading. As a police officer, Officer Prothro was expected to be familiar with Illinois laws regarding the possession of firearms, and he should have known that a citizen with a valid concealed carry license was allowed to possess a handgun with an extended magazine. Likewise, Officer Prothro should have recognized that ███ was not obligated to disclose that he possessed a firearm until Officer Smith asked, and that ███ response was adequate. If Officer Prothro was unsure of what was said during the interaction between ███ and Officer Smith, he should have sought more information from his partner before authoring and signing the related reports. Considering all of the above, and considering Officer Prothro's complimentary and disciplinary history, COPA recommends that Officer Prothro serve a 10-day suspension.

### c. Sgt. Ignatius Goetz

#### i. Complimentary and Disciplinary History

Sgt. Goetz has received four Department Commendations, three complimentary letters, 58 Honorable Mentions, and 15 additional awards and commendations. Sgt. Goetz received a one-day suspension for failing to initiate proper action as a supervisor for an incident that occurred in March 2020.

#### ii. Recommended Discipline

COPA has found that Sgt. Goetz violated Rules 2, 3, 5, 6, 10, and 11 by failing to properly direct subordinate CPD members, leading to ███ unjustified arrest. As an experienced CPD member and as a supervisor, Sgt. Goetz should have been familiar with Illinois laws regarding the possession of firearms, and he should have known that a citizen with a valid concealed carry license was allowed to possess a handgun with an extended magazine. Had Sgt. Goetz recognized that the officers under his supervision were applying the law incorrectly, he may have asked more questions about the encounter between the officers and ███ and may have prevented the officers from making an unjustified arrest. Considering all of the above, and considering Sgt. Goetz's complimentary and disciplinary history, COPA recommends that Sgt. Goetz serve a 15-day suspension.

Approved:

8-14-2023

_____        _____
Angela Hearts-Glass                     Date
*Deputy Chief Investigator*

Log # 2022-0532

## Appendix A

**Case Details**

| | |
|---|---|
| Date/Time/Location of Incident: | February 8, 2022 / 8:16 pm / 750 W 76th St., Chicago, IL 60620 |
| Date/Time of COPA Notification: | February 14, 2022 / 11:57 am |
| Involved Member #1: | Officer Carl Smith / Star #18090 / Employee ID # ████ / DOA: August 16, 2019 / Unit: 006 / Male / Black |
| Involved Member #2: | Officer Demetrius Prothro / Star #8805 / Employee ID # ████ / DOA: May 16, 2018 / Unit: 006 / Male / Black |
| Involved Member #3: | Sgt. Ignatius Goetz / Star #1664 / Employee ID # ████ / DOA: December 19, 2009 / Unit: 006/022 / Male / White |
| Involved Individual #1: | ████ / Male / Black |

**Applicable Rules**

☒ **Rule 2:** Any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department.

☒ **Rule 3:** Any failure to promote the Department's efforts to implement its policy or accomplish its goals.

☒ **Rule 5:** Failure to perform any duty.

☒ **Rule 6:** Disobedience of an order or directive, whether written or oral.

☒ **Rule 8:** Disrespect to or maltreatment of any person, while on or off duty.

☒ **Rule 10:** Inattention to duty.

☒ **Rule 11:** Incompetency or inefficiency in the performance of duty.

**Applicable Policies and Laws**

- 430 ILCS 66/10(h): Issuance of Licenses to Carry a Concealed Firearm
- Municipal Code of Chicago 8-20-085: High-Capacity Magazines and Certain Tubular Magazine Extensions – Sale Prohibited – Extensions
- 420 ILCS 66/90: Preemption
- 430 ILCS 65/13.1: Preemption
- 625 ILCS 5/11-804(b): When Signal is Required
- Municipal Code of Chicago 9-76-160: Registration Plates
- G01-09: Supervisory Responsibilities (effective 5/10/2021 to present).

## Appendix B

### Definition of COPA's Findings and Standards of Proof

For each Allegation, COPA must make one of the following findings:

1.  <u>Sustained</u> – where it is determined the allegation is supported by a preponderance of the evidence;

2.  <u>Not Sustained</u> – where it is determined there is insufficient evidence to prove the allegations by a preponderance of the evidence;

3.  <u>Unfounded</u> – where it is determined by clear and convincing evidence that an allegation is false or not factual; or

4.  <u>Exonerated</u> – where it is determined by clear and convincing evidence that the conduct described in the allegation occurred, but it is lawful and proper.

A **preponderance of evidence** can be described as evidence indicating that it is **more likely than not** that a proposition is proved.[96] For example, if the evidence gathered in an investigation establishes that it is more likely that the conduct complied with CPD policy than that it did not, even if by a narrow margin, then the preponderance of the evidence standard is met.

**Clear and convincing evidence** is a higher standard than a preponderance of the evidence but lower than the "beyond-a-reasonable doubt" standard required to convict a person of a criminal offense. Clear and convincing can be defined as a "degree of proof, which, considering all the evidence in the case, produces the firm and abiding belief that it is highly probable that the proposition . . . is true."[97]

---

[96] *See Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 191 (2005) (a proposition is proved by a preponderance of the evidence when it is found to be more probably true than not).
[97] *People v. Coan*, 2016 IL App (2d) 151036, ¶ 28 (quoting Illinois Pattern Jury Instructions, Criminal, No. 4.19 (4th ed. 2000)).

Log # 2022-0532

**Appendix C**

**Transparency and Publication Categories**

Check all that apply:

☐      Abuse of Authority

☐      Body Worn Camera Violation

☐      Coercion

☐      Death or Serious Bodily Injury in Custody

☐      Domestic Violence

☐      Excessive Force

☐      Failure to Report Misconduct

☒      False Statement

☐      Firearm Discharge

☐      Firearm Discharge – Animal

☐      Firearm Discharge – Suicide

☐      Firearm Discharge – Unintentional

☐      First Amendment

☒      Improper Search and Seizure – Fourth Amendment Violation

☐      Incidents in Lockup

☐      Motor Vehicle Incidents

☐      OC Spray Discharge

☐      Search Warrants

☐      Sexual Misconduct

☐      Taser Discharge

☐      Unlawful Denial of Access to Counsel

☐      Unnecessary Display of a Weapon

☐      Use of Deadly Force – other

☐      Verbal Abuse

☐      Other Investigation